RATTET, PASTERNAK & GORDON-OLIVER, LLP
Proposed Attorneys for the Debtors
550 Mamaroneck Avenue
Harrison, New York 10528
(914) 381-7400

Robert L. Rattet, Esq.
Arlene Gordon-Oliver, Esq.
Scott A. Steinberg, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
In re:

                                                        Chapter 11
HOTI ENTERPRISES, L.P.                                  Case No. 10-24129(RDD)


                              Debtor.
-----------------------------------------------------------------------X
In re:

HOTI REALTY MANAGEMENT, CO., INC.            Chapter 11
                                             Case No. 10-24130  (RDD)
                              Debtor.

-----------------------------------------------------------------------X


**DECLARATION OF VICTOR DEDVUKAJ  (A) IN OPPOSITION TO MOTION OF GECMC 2007 C-1 BURNETT STREET, LLC FOR (1) AN ORDER EXCUSING COMPLIANCE WITH SECTION 543 OF THE BANKRUPTCY CODE OR, ALTERNATIVELY CONVERTING THE CASE TO A CASE UNDER CHAPTER 7 AND (2) FOR RELIEF FROM  THE AUTOMATIC STAY OR DISMISSING THE CHAPTER 11 PROCEEDINGS AND (B) IN SUPPORT OF AN ORDER AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL AND TO PROVIDE ADEQUATE PROTECTION THEREFOR**


        Victor Dedvukaj, states under penalties of perjury pursuant to 28 U.S.C. section

1746 as follows:

        1.      I am the President of the debtor Hoti Realty Management Co., Inc. ("Hoti

Realty"), the corporate general partner of debtor Hoti Enterprises, L.P., ("Hoti Enterprises"). (Hoti Enterprises and Hoti Realty are collectively referred to herein as, the "Debtors")

2.     This affidavit is being submitted (1) in opposition to the Motion of GECMC 2007 C-1 Burnett Street, LLC ("Movant" or "Bank") for an Order Excusing Compliance with section 543 of the Bankruptcy Code, or alternatively, Converting the case to a case under Chapter 7; (2) in opposition to the Bank's Motion for an Order Granting (a) Relief From the Automatic Stay, or alternatively, (b) Dismissal of the Chapter 11 Cases; and (3) in support of the Debtors' Motion for use of Cash Collateral and to Provide Adequate Protection therefor.

3.     I submit this affidavit based upon my personal knowledge of the facts at issue herein.

# I
## BACKGROUND

4.     The debtor, Hoti Enterprises is a closely held limited liability partnership which owns and operates residential apartment complex located at 2801 Fillmore Avenue, 3001 Avenue R and 2719 Fillmore Avenue (collectively, known as "1865 Burnett Street") Brooklyn, New York (the "Property").   The limited partners of Hoti Enterprises are all family members.

5.     The Property was previously owned by my father, Gjelosh Dedvukaj who is also one of Hoti Enterprises' Limited Partners. My father is also 100% shareholder of Hoti Realty.

6.     From the inception of the Debtors' operations Hoti Realty was involved in every aspect of Hoti Enterprises' business affairs. Hoti Realty entered into the residential

apartment leases as landlord, collected all the rents, paid all the bills, provided the janitorial services and negotiated all other essential contracts for the upkeep and maintenance of the Property. In fact, with the exception of the water bill and mortgage payments all other financial obligations were undertaken by Hoti Realty and all payments were made by Hoti Realty's using its bank accounts. Hoti Realty's employees and management team also consists of several of Hoti Enterprises' limited partners.

7.     The Property has been in my family for over 32 years. In the 32 years that my family controlled the Property we had previously never missed a mortgage payment. My family invested their life saving in the Property and had hoped that their investment in the Property would have yielded my father and mother a source of income for their retirement.

8.      We are hard working people.  My father and mother are immigrants from Albania who speak very little English and they have no more than a sixth grade education. My mother and father carried refrigerators by hand and disposed of garbage with maggots on them, no matter rain or shine, their entire life to achieve the "American Dream".

9.     We believe that we are among the best landlords in Brooklyn and treat the tenants of the Property like family.  We have many elderly people that live in the Property, that we care of and check on, some as old as Anna Vincent who is 101. I have personally picked up the garbage for elderly tenants that cannot make it to the garbage room. I have more grandmothers than you can believe. When Ann Samochwal, a tenant in the Property had undergone surgery on her knee, I personally moved her to a brand new first floor apartment from a second floor apartment because she could no longer

walk up the steps.

10.     We worked with our tenants through this recession and had been able to collect the rents from our tenants notwithstanding the hard times that everyone has been experiencing.  We give a personal touch that can only happen through thirty-two (32) years of relationships with our tenants.  Thus the public interest weighs in favor of our retention of the Property.

11.      As a result of the service and love for the tenants and the way we treat our tenants and the Property, we made the Property into a "5th Avenue" style of living in Brooklyn. Annexed hereto as Exhibit A are pictures of the Property.

12.     We currently have a list of over 300 people that would like to move into the Property. In addition, the service that we provided translated into relatively high rents that we anticipated would be sufficient to operate the Property and cover the monthly mortgage payments.

13.     From the outset of its operations, the Property was severely undercapitalized and required constant infusions of cash by my family. My family infused over $1.5 million into the Property from personal funds.

14.     In addition to the undercapitalization of its operations, all of the apartments on the Property were rent stabilized. However, at a certain point my family decided that in order to raise capital to fund the operations, we sought to convert the apartment complex into a luxury condominium complex. However, to accomplish the conversion of the apartment complex to condominiums, we were first required to seek to decontrol the apartments by making capital improvements. Accordingly, we decided to refinance the existing mortgage for capital infusion necessary to commence substantial

renovations to the apartments in order to make the capital improvements to decontrol the apartments.

15.     The mortgage on the Property prior to the refinance was held by Independence Bank. However, on or about February 15, 2007, the mortgage on the Property was refinanced through Deutsche Bank and pledged as collateral to Deutsche Bank pursuant to an Amended, Restated and Consolidated Mortgage and Security Agreement, in the principal sum of $31,000,000 (the "Mortgage") which secured, among other things, payments due under an Amended, Restated and Consolidated Promissory Note with Debtor as maker dated as of February 15, 2007, in the principal sum of $31,000,000 (the "Note"). The Mortgage and Note was later assigned to Movant very shortly after the closing on the refinance.

16.     Unfortunately, we underestimated the magnitude of the work that would be required to undertake to complete the renovations on buildings that were over 70 years old. We expended additional monies for replacement of roofs, for entire new electrical wiring in all the buildings, for new plumbing and for new driveways.

17.     In order to reduce the costs of the renovations, my family provided most of the labor and also utilized the services of a construction company that I previously owned V& G Construction (this entity no longer exists).  However, as stated heretofore, the renovations ran above the budgeted amounts and took 21/2 years to complete which was much longer than the time frame that was originally estimated for completion. We were also forced to borrow additional funds from family members to complete the renovations and support Debtor's operations. Notwithstanding the foregoing, we successfully completed the renovations and ultimately received MCI Order authorizing us

to increase the rents. Annexed hereto as Exhibit B are the MCI Orders.

18.     To add to our problems, the Property's real estate tax payments increased by $40,000 per month, prompting the Bank to demand additional funds for tax escrow which increased the monthly mortgage payments from $177,000 to approximately $230,000 and which ultimately caused the first default on the monthly mortgage payments to the Bank. I was eventually successful in obtaining an abatement of the tax increase but the reduction came approximately one (1) year after the Bank commenced its action to foreclosure on the Property.

19.     In addition to the increase in the real estate taxes, water and sewer charges went up 110%, oil prices also tripled and insurance premiums that should have been paid from the Bank's escrow were not paid, forcing us to pay the insurance premiums directly from the operating account thereby decreasing the operating funds and reserves. To make matters worse, tenants who had lost their income due to the recession were also finding it difficult to keep current on their rent.

20.     As stated heretofore, the day after the closing on the refinance of the Property, the loan was sold and things became very confusing to us. There was no one to talk to about a tax escrow and insurance escrow increases that did not make sense to us. The monthly mortgage payments increased from $177,000.00 to $257,662.00. The Bank also charged us late fees that were erroneous.

21.     I initially went to the Key Bank who I thought bought the loan but they advised me that they did not own the loan and that they were just the servicer and could not help us with any issues. We thereafter discovered that there was a special servicer LNR Partners and we attempted to do a workout with them.

22.     Before we missed a payment, we contacted the Bank to advise them that as a result of the tax increase and escrow increase we were expecting to encounter difficulties maintaining the mortgage payments on the Property. What we actually failed to discover initially was the fact that when my father signed the closing documents for the refinance of the Property with the Bank, the Bank had included a monthly escrow for insurance premium payments although we had always paid the insurance premiums directly to the insurance company. As stated heretofore, my father speaks very little English and has no more than a 6th grade education.   Annexed hereto as Exhibit C are correspondence and checks paid to the insurance company showing that we had been paying the insurance on the Property since the inception of the loan.

23.     I advised the Bank of its error and I was promised that it would be resolved and any money paid into the insurance escrow would be refunded.  I made many attempts to contact Galen Brin at Key Bank who was the representative that originally told me that he would take care of the problem and would get us a refund for the insurance monies but I received no return calls. Annexed hereto as Exhibit D are copies of correspondence sent to the Bank and received from the Bank indicating that the Bank was aware of the problem.

24.     I submit that if the Bank had followed through on refunding the money as they had promised to do, the monies would have been available for me to use to pay the difference in the mortgage payment for that month and would have gone a long way to solving our problems. Unfortunately, the Bank never followed through on its agreement and communication with the Bank became worse when the banking industry collapsed.  I later discovered that Gale Brin was fired. Accordingly, it was very difficult to work with

the Bank from thereon; as many people lost there jobs and the banks were understaffed.

25.     Prior to being in default on the mortgage payments to the Bank, we also sought legal advice. We went to the law firm of Reich & Reich, LLP (the "Reich Firm") for assistance and they also tried to negotiate a resolution with the Bank. Unfortunately, notwithstanding our efforts to modify the mortgage with Reich's assistance and the consent of the Bank, the negotiations fell apart.

26.     Accordingly, notwithstanding our attempts to work with the Bank on a solution to our financial predicament, including the possible refinance of the Property, on or about February 27, 2009, the Bank commenced an action to foreclose the Mortgage entitled *GECMC 2007-C1 Burnett Street, LLC. v. Hoti Enterprises, L.P., et al.* (N.Y. Supreme Court, Kings County, Index No. 5006/2009) (the "Foreclosure Action") and  by Order dated March 16, 2009 in the Foreclosure Action, Barbara Odwak, Esq. was appointed receiver of the Property (the "Receiver").  The Receiver filed her oath and bond and took possession and control of the Property on or about May 12, 2009 to collect rents and otherwise maintain the Property.

27.     The Chapter 11 cases were filed because all efforts to negotiate with the Bank for the last 17 months have failed.  As stated heretofore, we were previously represented by the Reich Firm. However after the negotiations fell apart with the Bank, we then decided to hire new counsel, Rattet, Pasternak & Gordon-Oliver, LLP., to commence  Chapter 11 proceedings on behalf of the Debtors which we believed would demonstrate to the Bank our earnest desire to resolve our issues with the Bank. Accordingly, on October 12, 2010 (the "Petition Date"), the Debtors filed their respective voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

**II**

**THE DEBTOR HAS NOT MISMANAGED THE PROPERTY**

28.     The Bank has alleged in its Motion that we have of mismanaged the Property. The Bank allegations could be no further from the truth. Contrary to the Bank's allegations, it is the Receiver and her management company that has mismanaged the Property, forcing the tenants to vacate the Property and thereby resulting in further reduction in the value of the Property. Annexed hereto as Exhibit E is a copy of a newspaper article demonstrating BPC Management's mismanagement of another property in Brooklyn.

**A.      _It Is The Receiver Who Is Guilt_
          _Of Gross Mismanagement_**

29.     We took very good care of the Property when it was in our possession. My father personally took care of the beautiful landscaping.  The Long Island sod was laid by me and my father and the lawns were cut every four days. (See Ex A)

30.     Since the Receiver took possession, the tenants and the superintendent have advised me that:

-      The apartments are now infested with roaches and rats because Receiver has

       failed to provide monthly pest control.

-      The safety of the tenants are now at risk because Receiver has failed to keep

       the Property properly secured:

       •   Receiver has allowed the automatic gates enclosing the Property to fall
           in to disrepair allowing intruders to enter the Property;
       •   Receiver has allowed the security cameras to fall into disrepair and
           they are currently not working;

- Receiver allowed a 700 foot fence that blew over into the parking lot in the March 2010 storm to remain on the parking lot for months causing a tenant to injure herself;
- Receiver has failed to keep the outside security lights on at night since she took possession of the Property.

- Receiver failed to repair water damaged to one of the buildings damaged by the March 2010 storm for over 6 months causing ceilings above the front windows in the apartments to "cave in".

- Receiver reduced certain the rents at the 3006 Avenue R building without the authority of Department of Housing Community and Renewal which must approve any rent increases are decreases to rent stabilized apartments.

- Receiver failed to turn on sprinkler system for 16 months causing the grass & shrubbery to dry up.

- Receiver failed to fertilize the lawns & shrubs for 6 months causing weeds to over take the lawn.

- Receiver failed to purchase salt for snow and ice removal in the winter causing slip hazards to tenants and pedestrians.

31.      All the landscaping is now ruined as all the grass has turned into weeds because the Receiver failed to water the grass for weeks. The Receiver did not use an automatic sprinkler system that we installed.  My father and I weeded the flower beds, now the weeds have killed the flowers. We put our entire life savings and everything we had in that Property. Attached hereto is an affidavit from the superintendent Ljubo Marasavic, detailing the Receiver's mismanagement of the Property.

**B.**     *Vacancy Rate Has Increased Dramatically*

32.     There were only two (2) vacant apartments when the Receiver, took possession of the Property. There are now there fifty (50) vacant apartment and (28) empty garages and thirty-one (31) vacant parking lots. The Receiver has not taken care of the Property and has caused significant losses as a result of her mismanagement of the Property. The Property value has depreciated to the detriment of the Debtor and the Bank from the drastic increase in tenant vacancies and the resulting decline in the value.

33.     On July 28, 2009, the Receiver sent an email asking me to help rent apartments. We tried many times to rent apartments and stand ready willing and able, but through the Receiver's negligence, tenants that we referred to her were turned away without being given an opportunity to rent the apartments.

34.     I continuously informed the Bank through counsel of the problem with the vacancies but nothing was done. In September 2010, the Receiver sent a letter requesting assistance in renting the apartments but again the Receiver did noting when I sent tenants to her. In fact, the superintendent of the property advised me that he was threatened with the loss of his job if he showed any of the vacant apartments to any prospective tenant. Annexed hereto as Exhibit F is the Receiver's Sept 2010 letter.

**C.**     *Receiver's Failure to Cooperate to Reduce Real Estate Tax Liability*

35.     Notwithstanding the allegations that we mismanaged the Property, the facts reflect that my efforts to assist in any way that I could to the benefit of the Bank has been endless.

36.     These efforts included my attempts at obtaining tax abatement on the

Property in order to reduce operating expenses for the Property.

37.     We previously hired the law firm of Podell Schwartz ("Podell"), to assist us in reducing the tax assessment against the Property. Podell was successful in not only obtaining a tax abatement for the Property but in securing a tax refund for the tax years 2008 and 2009.

38.     This refund check was turned over to the Bank.     Annexed as Exhibit G is a Notice of Reduction in Assessed Value of $1,753,000 and a letter dated August 25, 2009 from Podell Schwartz reflecting the refund of $41,146.52.

39.     In addition, we also received from Podell an additional refund check in the amount of $ 41,146.52. Annexed hereto as Exhibit H is an additional letter dated August 25, 2009 from Podell which was also sent to the Bank and additional Notice of Reduction in Assessed Value of $1,386,500.

40.     These saving were all accomplished by my actions and not by the Receiver.

41.     Unfortunately, notwithstanding a request from Podell, the Receiver failed to give Podell the information necessary to receive the tax abatement for the Property for this current calendar year 2010 and to make matters worse the time frame to receive this abatement has now expired. It is clear that the Receiver's actions and/or inactions have caused the Bank not only to lose the benefit of the reduction but also lose the refund that the estate would have been entitled to receive.

D.     *__Management Fees Were Not Paid To Hoti Management__*

42.     The Bank alleges that we paid exhorbitant management fees to ourselves. We did not take management fees as the Bank has alleged. The monies paid through Hoti

Management were paid as salaries for the employees; for labor and materials for the renovations to the apartments; and for services supplied on behalf of the Property. The Debtors' accountant is currently reviewing the Debtors' books and records in order to provide a **clear** picture of the disbursements that were made by Hoti Realty that were erroneously booked as management fees in the financial statements previously submitted to the Bank. The disbursements styled as management fees were substantial for the periods in question because of the renovations that were undertaken at that time.

### E.    *Tenant Leases have always been held by Hoti Management*

43.        The Bank also alleges that we violated the terms of the Assignment of Leases and Rents by having the tenant leases held by Hoti Realty. Hoti Realty was set up for the sole purposes of holding the leases for the apartments and managing the Property.

44.    The Bank fails, deliberately or otherwise, to advise the Court that, prior to the refinance of the mortgage, Hoti Realty was always the entity that held the leases with the tenants.

45.    If it was a requirement that the leases were to be in the name of the Hoti Enterprises then it should have been dealt with at the closing on the refinance. My father was never advised that he was required to do this at the closing on the refinance nor did the Bank inform us at any time thereafter that it wanted the apartment leases to be switched over to the Hoti Enterprises. If they had requested same we would have complied.

46.    Accordingly, the Bank is not in a position to now complain and cannot

accuse us of any wrongdoing or violation of any agreement because the Bank was or should have been fully aware that the tenant leases were never in the name of the Hoti Enterprises and that was the way we always conducted the Debtors' business operations.

**F.**     ***Tenant Rent Deposit Accounts will be established  immediately***

47.          The Bank has also alleged that we failed to turn over tenant rent deposits to the Receiver.  There are no tenant rent deposit accounts because we never kept segregated tenant rent deposit accounts.

48.     My father operated the Property for over 32 years and never had a tenant rent deposit account. Unfortunately my father was unaware that the tenant rent deposits needed to be segregated and was never advised that he should have set up said accounts. He kept all tenant rent deposits in the general operating account and would remit to the tenants, interest on their rent deposits from the operating account and would also return any unused rent deposit from said accounts.

49.     This issue was never brought to his attention. The Property was refinanced and no one ever requested that we open tenant rent deposit accounts.

50.          However we are fully prepared to set up tenant rent deposit accounts immediately and have already secured the funds necessary to do so.  Annexed here to as Exhibit I is proof of the funds available for deposit into said accounts.

***G***     ***All Rents Collected after the Appointment of the Receiver were***
        ***turned over to the Receiver***

51.     The Bank also alleges that we collected rents from tenants and failed to turn over such rents after the appointment of the Receiver but before the Receiver took possession of the Property.  This could be no further from the truth.

52.     We turned over everything we collected to the Receiver, including all mail and other correspondence received during that period.

## III

## THE COURT SHOULD DENY THE RELIEF
## REQUESTED BY THE BANK

53.     The Bank has requested the entry of Orders:(1) Excusing compliance with section 543 of the Bankruptcy Code or, alternatively converting the case to a case under chapter 7; and  (2) For relief from the Automatic Stay or alternatively, dismissing the Chapter 11 proceedings.

54.     I submit that the Bank is not entitled to the relief it has requested as the Bank should not be able to profit from its own maladroit actions, malfeasance and mistakes that has put the Debtors in the predicament they now face.

***A.***     ***Bank's Actions Have Thwarted the Debtor's Efforts***
        ***to Satisfy the Mortgage***

55.     As stated heretofore, immediately after the refinance of the Property, the loan was sold. The refinance closed in February 2007 and shortly thereafter we began experiencing difficulties.

56.     Prior to our current financial difficulties, our track record will show that

for 32 years we never missed a payment on our mortgage.  In addition we made payments to the Bank until the Bank increased the tax escrow and mysteriously increased the insurance escrow.

57.     Before we missed a payment we contacted the Bank to advise them that as a result of the tax increase and escrow increase we were expecting to encounter difficulties maintaining the mortgage payments on the Property.

58.     When we discovered that the Bank for some reason included an escrow for insurance premium in our monthly mortgage payments although we had always paid the insurance premiums directly to the insurance company, we advised the Bank and they assured us that they would fix the problem but the Bank never did.

59.     This created a major cash flow issue for us as we were paying insurance premiums out of the operating budget and in addition we were now being charged a substantial amount for insurance escrow. The Bank knew this and did nothing to fix the problem.

60.     In addition, from the inception, the Bank's analysis of the value of the Property was flawed. The Property was refinanced at the height of the real estate market. At the time that the Bank conducted its appraisal (the "Bank's Appraisal")  of the Property, it based its appraised value of the Property on the comparable sales of condominium apartments in the area and in Manhattan. Annexed hereto as Ex J is a copy of the Bank's Appraisal.

61.     The Bank's appraised value of the Property was $42,700,000.(See page 2 of the Bank's Appraisal)  The appraisal reflects that each unit was worth $300,000 based upon the going prices of condominium apartments at that time.  (See page 114 of the

Bank's Appraisal)

62.     Based upon the Bank's appraisal, we thought we had a Property with substantial equity and therefore we proceeded to refinance the Property. Unfortunately, the level of debt service that we were obligated to pay was also tied into the flawed assumptions contained in the Appraisal.

63.     We conducted our own appraisal of the property in December 2008. We retained Jim Levy from Appraisers and Planners to conduct the appraisal.   To our surprise the Property appraised at a value of $14,450,000.   Annexed hereto as Exhibit K is a copy of the Appraisal Report conducted by Appraiser and Planners.

64.     In addition, what we did not envision at the time was the total collapse of the real estate market. We had also relied on the Bank's flawed analysis of the Property for the level of debt service that we could afford to pay.

65.     As soon as we started experiencing difficulties, we therefore went to the Bank in an effort to negotiate a modification of the existing mortgage based upon our new appraisal that reflected a more accurate picture of the monthly debt service that we could afford to service as a rental Property. The Bank refused to negotiate a modification of the Mortgage and Note.

66.     We have been advised that the Bank has conducted a recent appraisal of the Property which values the Property at approximately $18 million. However, we have not seen that appraisal.

**B.**    ***Efforts to Refinance also Thwarted by Bank***

67.    Our efforts to refinance the Property has also met with the same fate as detailed above, as no prospective investor or lender that we approached would offer any amount close to the $38 million that the Bank asserts it is owed.  Annexed hereto as Exhibit L is a quote that we received from a potential lender at that time.

**C.**    ***Efforts to complete Condo Plan thwarted by the Bank's Receiver***

68.    In an effort to raise the capital necessary to pay the Bank we also continued our attempts to convert the apartments to condominium units.  However, by letter dated August 12, 2009, that was also sent to the Bank's counsel our lawyer handling the conversion, Harold Gruber, Esq., advised us that because of the increased vacancy rate the condominium conversion plan could not be complete because the Property at the time had more that a 10% vacancy rate. Annexed hereto as Exhibit M is the retainer memorandum from Gruber and a copy of a check retainer Gruber.

69.    Again through no fault of our own, our attempts to pay off the Bank through a conversion of the Property to condominiums failed because the Receiver allowed the vacancy rate to increase.

70.    The potential value of the Property upon conversion to a condominium complex was approximately $62 million. Annexed hereto as Exhibit N is a broker's opinion letter setting forth the value of each apartment if same were converted to a condominium.

# IV

## MOVANT'S REQUEST TO LIFT THE
## AUTOMATIC STAY IS PREMATURE

71.     If we are given the opportunity, we have the ability to rent the apartments and bring the Property back to the original condition for the benefit of the estate.

72.     I submit that within a short period of time with the Property fully rented, we will be able to either (1) find an investor who would be willing to purchase the note from the Bank and /or (2) fund a chapter 11 Plan; or (3) sell the Property.

73.     In fact, I have had ongoing discussions with various parties and investors who have already expressed interest in the Property in its present condition.  One such entity, ROSDEV, has already made a proposal to the Bank to either purchase the Property or the purchase Note from the Bank.  Annexed here to as Exhibit O is the ROSDEV proposal.

74.     Unfortunately, the Bank has rejected the proposal. However, I am working with several other parties but will need time to complete said negotiations. Annexed hereto as Exhibit P is a copy of an Exclusive Advisory Agreement from the Carlton Group, Ltd.

75.     I have been advised that a debtor under Chapter 11 is afforded a reasonable time frame to file a Chapter 11 Plan or to commence payments of adequate protection to the secured creditor if the debtor is a single asset real estate debtor.

76.     I have been further advised that  11 U.S.C. §362(d)(3) sets forth a ninety (90) day time limit for a single asset real estate debtor to file a plan or commence making payments to the secured lender. Therefore, I submit that the Debtor's time period to

accomplish the objectives of being in chapter 11 should not be shortened at the whim of the Bank.

77.     Accordingly, the Court should grant the Debtor at least the ninety (90) day period provided by 11 U.S.C. § 362(d)(3) to formulate a plan to reorganize or at least be given the time to sell the Property or a portion of the Property pursuant to Section 363 under the supervision of the Bankruptcy Court in order to satisfy a portion if not all of the Bank's claim. [1]

## V

## THE COURT SHOULD DIRECT TURNOVER
## OF THE PROPERTY

78.     Based on the foregoing I request on behalf of the Debtor, that the Court deny the relief requested by the Bank and directs the turnover of the Property. I further request that the Debtors be authorize to use Cash Collateral for the operation and maintenance of the Property and be further authorized to make adequate protection payments to the Bank pursuant to the Budget annexed hereto as Exhibit Q.

79.     In the event that the Court is not inclined to grant my request and determines that the Receiver should be excused from compliance with Section 543 then at the very least, the Court should authorize the Debtors to manage the Property on behalf of the Bank.

80.     I request the foregoing relief based upon the fact that the Receiver has not been able to manage the Property to the detriment of the Debtors' estate. I further submit that the Debtors are in the best position to manage the Property as the Receiver has

---

[1] The Court should also consider referring this matter to mediation.

proven that she is incapable of properly managing the Property.

81.     Accordingly, to avoid further decline and deterioration of the Debtors' estate, I request that the Debtor be placed in possession of the Property and be authorized to use Cash Collateral and provide adequate protection for said use to the Bank.

**A.**     ***Request For Authority To Use Of Cash Collateral***
       ***And To Provide Adequate Protection To The Bank***

82.     If the Court denies the relief requested by the Bank and directs the turnover of the Property, the Debtors' counsel has advised me that the Debtors cannot operate the Property unless the Debtors have authority to use cash collateral pursuant to the Bank's consent or the authority of the Court. Accordingly, in anticipation of the turnover of the Property I hereby request authority of the Court for the Debtors to use cash collateral in which the Bank has asserted a security interest.

83.     The Debtors' counsel has further advised me that:

> Section 363(a) of the Bankruptcy Code states as follows: "In this section, "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of properties subject to a security interest as provided in Section 552(b) of this title, whether existing before or after the commencement of a case under this title."

84.     Section 363(c)(1) of the Bankruptcy Code provides as follows:

> "(c)(1) If the business of the debtor is authorized to be operated under section 721, 1108, 1304, 1203, or 1204 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business,

without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing".

85. Section 363(d) of the Bankruptcy Code provides as follows:

"(d) The trustee may use, sell, or lease property under subsection (b) or (c) of this section only to the extent not inconsistent with any relief granted under section 362(c), 362(e), or 362(f) of this title".

86. Accordingly, pursuant to Section 363(c)(2) of the Code, the consent of Bank, or authority from this Court are required for the Debtors to use cash collateral in which Bank asserts that it holds a perfected, first priority security interest and I hereby request said authority from the Court.

**B.** *Adequate Protection*

87. In addition, I also request on behalf of the Debtors that the Debtors be authorized to provide adequate protection to the Bank to ensure that the Bank receives the value for which it bargained pre-bankruptcy.

88. As adequate protection for the Debtors' use of Bank's cash collateral and in consideration for the use of the cash collateral and in accordance with the proposed Budget annexed hereto, the Debtors propose to grant Bank replacement liens in all of the Debtors' pre-petition and post-petition rents to the extent that Bank had a valid security interest in said pre-petition rents as of the Filing Date. The replacement liens shall be subject and subordinate to (a) fees payable under 28 U.S.C. §1930 and (b) professional fees of duly retained professionals in this Chapter 11 case. The replacement liens shall not extend to the recovery of funds or proceeds from the successful prosecution of avoidance actions pursuant to sections 502(d), 544, 545, 547, 548, 549, 550 or 553 ("Avoidance Actions") of the Bankruptcy Code.

89.     The proposed adequate protection to Bank is appropriate because it is designed to protect Bank against diminution in the value of its interest in the Collateral.

90.     I submit that, in order to preserve the Debtors' estates and ensure the viability of the Property pending the hearing, the Bank should be granted replacement liens with the same nature, extent and validity of its pre-petition lien, subject to investigation by any creditors' committee appointed in the Debtors' Chapter 11 cases.

91.     I submit that the Debtors will use cash collateral only for ordinary and necessary operating expenses substantially in accordance with the operating Budget annexed hereto.  I believe that the Budget includes all reasonable, necessary and foreseeable expenses to be incurred in the ordinary course of business for the period set forth in the Budget.  The Debtors believe that the use of Cash Collateral in accordance with the Budget will provide the Debtors with adequate liquidity to pay administrative expenses as they become due and payable during the period covered by the Budget.

92.     In the event of a turnover of the Property to the Debtors, the immediate and continued use of cash collateral will be essential to the operation of the Property, and will not only preserve the estate but will help to maximize its value for the benefit of all creditors and the Bank.

93.     Without authority to use cash collateral in the event that the Court directs the turnover of the Property, the Debtors will not be able to pay for utilities, make payroll and pay other imminent and necessary expenses to sustain its operations.

94.     If the Debtors are not permitted to use cash collateral, the tenants will possibly be in danger of losing essential utilities and services.

95.     The Debtors therefore need to obtain authority to use cash collateral of

Bank pursuant to and in accordance with the proposed Budget.

96.     In addition, the Debtors propose to pay Bank the net cash proceeds after operating expenses have been paid as further adequate protection of Bank's interest in the Property.

97.     I submit that this request for use of cash collateral herein is reasonable, proper and in the best interests of the Debtor's estate in the event that the Court denies the relief requested by the Bank and directs the turnover of the Property.

98.     Furthermore, the granting of authority to use cash collateral will increase the likelihood that we will be able to find an investor or lender to refinance the Property; and/or propose a Chapter 11 Plan or a purchaser for the Property.

99.     No previous application for the relief requested herein has been made.

WHEREFORE, I request that the Court deny the relief requested by the Bank.


*/s/ Victor Dedvukaj*
Victor Dedvukaj

**VERIFICATION/DECLARATION UNDER PENALTY**
**OF PERJURY BY VICTOR DEDVKAJ**

I, Victor Dedvukaj declare under penalty of Perjury pursuant to 28 U.S.C. §1746 that I have read the foregoing affidavit and attachments thereto and that it is true and correct to the best of my knowledge, information and belief except as to the matters therein stated to be alleged upon information and belief.

Dated:  Harrison, New York
             November 17, 2010

                              */s/ Victor Dedvukaj*
                              Victor Dedvukaj