DWYER & ASSOCIATES LLC

*Proposed Attorneys for Debtor*
11 Broadway, Suite 615
New York, NY 10004
Tel: (212) 203-4757
Email: info@dwyerlawnyc.com

Tanya P. Dwyer, Esq.

**Hearing Date and Time:**
**Objection Deadline:**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

HOTI ENTERPRISES, L.P. and
HOTI REALTY MANAGEMENT CO., INC.

                                Debtors.

Chapter 11
Lead Case No. 10-24129 (RDD)
Case No. 10-24130 (RDD)

------------------------------------------------------------x

**MOTION TO RECONSIDER AND CLARIFY,
UNDER FED. R. CIV. P. 60(B), AS APPLICABLE BY FED. R. BANKR. P. 9024,
(A) THE ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY AND
(B) THE SERVICER'S ROLE WITH REGARD TO GECMC 2007 C-1 BURNETT
STREET, LLC IN THESE PROCEEDINGS**

TO:    THE HONORABLE ROBERT D. DRAIN
          UNITED STATES BANKRUPTCY JUDGE

       Hoti Enterprises, LP, and Hoti Management Company, Inc. ("the Debtors"), by and through their proposed counsel Dwyer & Associates LLC, respectfully submits this motion for reconsideration and clarification (the "Motion") pursuant to Fed. R. Civ. P. 60(b), ("Rule 60(b)") made applicable hereto by Fed. R. Bankr. P. 9024 ("Bankrupcty Rule 9024"), for an order reinstating the automatic stay, and further ordering production of the agreement defining L&R's ("Servicer") roll and relationship with investor GECMC 2007 C-1 Burnett Street, LLC ("GECMC"), for inspection by Debtors and their proposed counsel.

**PRELIMINARY STATEMENT**

1. This Motion seeks equitable and just relief in the administration of this case. The Debtors seek to reinstate the automatic stay as to the interests of GECMC in the primary asset of the bankruptcy, a property located at 1865 Burnett Street (the "Building" or the "Property"), currently in foreclosure. The Debtors request an opportunity to truly experience the benefits and protections afforded by a well-executed bankruptcy petition and plan of reorganization. Foreclosure sale would realistically produce no greater result than the cash offers already made to creditor during these bankruptcy proceedings. Therefore, the GECMC Trust stands to gain more from a properly executed Bankruptcy plan that includes the property, than a foreclosure sale.

**BACKGROUND**

2. On April 1, 2010, the Debtors retained counsel Rattet Pasternak & Gordon-Oliver, LLP ("RPGO") to advise them in filing Bankruptcy under Chapter 11 of the Bankruptcy Code. Debtors' RPGO invoices reflect that on
    a. April 6, 2010, a third party paid RPGO $5,000,
    b. April 14, 2010, a third party paid RPGO $7,500,
    c. April 23, 2010, a third party paid RPGO $10,000,
    d. September 1, 2010, a third party paid RPGO $20,000,
    e. October 6, 2010, a third party paid RPGO $6,000,
    f. October 7, 2010, a third party paid RPGO $14,000.
3. On October 12, 2010, Debtors, through counsel RPGO, filed their voluntary bankruptcy petitions.
4. On December 6, 2010, RPGO sent debtors an invoice requesting an additional $64,798.34, which debtor has not paid.
5. On January 11, 2011, RPGO sent debtors an invoice requesting $86,808.26, which debtor has not paid.
6. On February 12, 2011, Debtors received an updated invoice from RPGO requesting $111,703.07 for post-petition work.
7. Upon information and belief, the debtors were not consulted about creating a multi-year plan or re-organization.

8. Upon information and belief, the Debtors were not consulted about the adequate protection and cash collateral stipulation. Had the Debtors been consulted, RPGO, the appointed receiver and GECMC would have been told by Debtors that the plan would leave the building financially vulnerable in the present winter months.

9. This Court's December 20, 2010 Hearing Transcript (Hrg. Tr.) supports this last point (Exhibit A):

   a. The Court at 12:9-19. "If you could use the Bankruptcy Code, as Mr. Rattet has used the Bankruptcy Code countless times, to buy some time to find a buyer for the property at a fair price, then you could do that. And if the lender it appears to me is acting irrationally, which nothing in the record suggests today, then I may have some power to deal with them on that. But there's no sense of that today. And I'm not going to hold up their rights to adequate protection over some speculation about that they're acting irrationally when there's nothing to suggest they are."

   b. The Court: "What you're entitled to I believe, but not today, is to look at the underlying documents to see who controls the decisions on the loan. Most of the documents for securitization say that the servers are supposed to act with regard to the property as it would with regard to its own property…. You know what? Just get the copy of [the servicing agreement]. All right…. And read it. Which no one really did with this stipulation. I have marked it up to reflect what I told you all to put in it last time. I spent an hour, which someone should have done, particularly since I alerted you and Ms. Gordon-Oliver that I have done that now with stipulations from your firm several times. I don't wish to do it again. Protecting your client and estate. Make the changes and get it entered." (Hrg. Tr. 12:25 -13:5; 13:10-11; 13:13-20).

   c. The Court: "I'll see you all about January 12th. Unless there's some progress in this case, I'm telling you this lender will probably get stay relief…. I'm not going to go through one of these again and mark it up for your client." (Hrg. Tr. 13:24 –14:1; 14:5-6).

10. Upon information and belief, the service agreement (a.k.a pooling and servicing agreement) has not been provided to the debtors and RPGO.

11. The record reflects that the building's fair market value, and expected foreclosure value, is $14.5 million.

12. Victor Dedvukaj, President of both debtors, has actively and successfully found multiple potential investors willing to commit between $14.5 million and $17.5 Million *in cash*.

13. Upon information and belief, these offers have not been presented to the GECMC Trust by the servicer, who may or may not have an inherent conflict with the GECMC Trust regarding the offered amount.

14. Upon information and belief, RPGO has not tried to compromise with GECMC and its agents in the interests of realizing the building's potential profitability, other than the cash offers found by Victor Dedvukaj.  It is not clear that options such as a Section 1111(b) election were discussed with GECMC to find a meeting of minds.

## RELIEF REQUESTED

### I. THE ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY SHOULD BE MODIFIED, AMENDED OR VACATED UNDER RULE 60(b)

15. Rule 60(b) provides, in relevant part:

>    **Mistake; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, Etc.** On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect;(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

16. A motion for relief from an order is within the broad discretion of the court. *See In re AMC Realty Corp.,* 270 B.R. 132, 143 (Bankr. S.D.N.Y. 2001) *citing Nemaizer v. Baker,* 793 F.2d 58, 61-61 (2nd Cir. 1986). In exercising this discretion, courts should balance the policy in favor of serving the ends of justice against the policy in favor of finality. *AMC Realty Corp.,* 270 B.R. at 143; *see Paddington Partners v. Bouchard,* 34 F.3d 1132, 1144 (2d Cir. 1994).

17. As more fully set forth below, under the circumstances, the possible mismanagement of the Debtors' petition and plan warrants relief pursuant to Rule 60(b).

   **A. Grounds Exist Under Rule 60(b)(1) for the Court to Grant Relief from the Order Lifting the Automatic Stay**

18. As stated above, Rule 60(b)(1) states that "the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for: (1) mistake, inadvertence, surprise or excusable neglect." Fed. R. Civ. P. 60(b)(1).  This rule is to be liberally construed so that doubtful cases may be resolved on the merits.  *Hibernia Nat'l Bank v. Administration Central Soceidad Anonima,* 776 F.2d 1277, 1279 (5th Cir. 1985).

19. Whether by mistake, inadvertence, or excusable neglect, RPGO advised Debtors for more than nine months and were unable to create an adequate protection and collateral cash stipulation that protected the Debtors and their estate. (See Paragraph 9 above).

20. The Debtors, therefore respectfully request that they now be afforded the opportunity to be heard in this Court.  More specifically, they request an opportunity to show the GECMC investors and all other creditors that they stand to gain more from a creative bankruptcy plan with cash investments than they would from a foreclosure sale.

   **B. Grounds Exist Under Rule 60(b)(2) for the Court to Grant Relief from the Order Lifting the Automatic Stay**

21. Rule 60(b)(2) states that "the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for: (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time…." Fed. R. Civ. P. 60(b)(2)

22. This Court stated on December 20th that "[m]ost of the documents for securitization say that the servers are supposed to act with regard to the property as it would with regard to its own property…. You know what? Just get the copy of [the servicing agreement]…. And read it."  (Hrg. Tr. 13:2-5, 10-11, and 13).

23. There is reason to believe that the GECMC Trust service agreement is typical of pooling and servicing agreements filed with the Securities and Exchange Commission.  The information contained therein may have had a profound impact on the Servicer's decision to put the Building back into foreclosure proceedings.

24. The essence of the Lift Stay Order was to give GECMC an opportunity to get protection of its interest in the free market.  The Servicer has acknowledged on the record that the free or fair market value of the Building is $14.5 million dollars. The Debtors have

worked tirelessly to make multiple cash offers above the fair market value. There is still an offer available for $17.5 million as of the time of filing. These offers are being made by entities that see the Building and its operation as an investment opportunity when combined with the goodwill/intangible assets of the Debtors.

25. For these reasons, the Debtors respectfully request that the Court reconsider the order lifting the automatic stay as it pertains to the Servicer and GECMC.

### C. Grounds Exist Under Rule 60(b)(6) for the Court to Grant Relief from the Order Lifting the Automatic Stay

26. Even if relief from the Lift Stay Order is not warranted under Rule 60(b)(1) or (2), which it is, equitable relief is warranted under Rule 60(b)(6).

27. The principal purpose of Rule 60(b)(6) is to cover unforeseen circumstances, such as those present here. Pursuant to Rule 60(b)(6), a court has the authority to grant relied from a judgment or order, whenever, after considering all the relevant circumstances, such an action is deemed appropriate in the furtherance of justice. *See Klapprott v. United States,* 335 U.S. 601, 614, 615, 93 L.Ed. 266, 69 S. Ct. 384 (1949). As the Court declared in AMC Realty Corp., the underlying purpose of Rule 60(b)(6) is "to do justice in a particular case when relief is not warranted by the preceding clauses." 270 B.R. at 143.

28. This equitable relief may be properly granted where "there are extraordinary circumstances justifying relief, … when the judgment may work an extreme and undue hardship, … *and* when the asserted grounds for relief are not recognized in clauses (1)-(5) of the Rule." *Id.* (emphasis in original) (*citing Nemaizer*, 793 F.2d at 63). The Second Circuit has stated that one or the other of the first two prongs had to be shown, without requiring that both of them be satisfied. *See PRC Harris, Inc.,* 700 F.2d 894, 897 (2d Cir. 1983), *cert. denied*, 464 U.S. 936, 104 S. Ct. 344, 78 L.Ed.2d 311 (1983).

29. The essence of the Lift Stay Order was to give GECMC an opportunity to get protection of its interest from the free market. It is largely acknowledged that the free or fair market value of the Building is $14.5 million dollars. The Debtors have worked tirelessly to make multiple cash offers above the fair market value. There is currently an offer available for $17.5 million as of the time of filing. These offers are seen as investment opportunities by entities that have found value in the Debtors and their good will/intangible assets.

30. It is extraordinary that RPGO was unable to protect the interest of the Debtors in basic ways. It is also extraordinary that RPGO may have billed roughly $175,000 for nine months of Chapter 11 counseling that resulted in no real benefit for the Debtors; critical lack of communication with regard to the cash collateral order and RPGO's possible breach of their fiduciary duty to the Debtors' estates certainly create undue hardship, especially when the financial viability of the Debtors relies on the lost asset, the Building in foreclosure.

31. In *Count Liberty,* 370 B.R. at 281 the Court stated that "[t]he Rattet Defendants are correct to a point in arguing that they had no obligation to "*ensure*" its clients' compliance with agreements. "While counsel's duty to the estate may not rise to the level of a policeman for the debtor's post-petition conduct, an attorney for the debtor in possession has fiduciary obligations to the estate stemming from his fiduciary obligations to the debtor in possession and his responsibilities as an officer of the court." *Count Liberty,* 370 B.R. at 281. As this Court concluded in *In re St. Stephen's 350 East 116th St.,* 313 B.R. at 171, the attorney "cannot simply close his or her eyes to matters having an adverse legal and practical consequence for the estate and creditors." That is essentially the allegation made against the Rattet Defendants in the complaint. *In re Food Management Group, LLC*, 380 B.R. 677 (Bankr. S.D.N.Y. 2008)

32. *In re Zagara's Fresh Markets, LLC,* shares some similarities to the Debtors attorney-client relationship with RPGO. However, this was a claim for compensation by the debtor's incompetent attorney. (*Not Reported*, in B.R., 2006 WL 4452980 (Bankr. D.N.J.,2006)). The court outlines why that attorney was considered incompetent:

    1. Maselli (debtor's attorney) failed to guide the professionals through the bankruptcy;

    2. He incurred needless fees and costs, including $100,000 in professionals that performed overlapping services;

    3. He provided no benefit to the estate.

    4. His application contains numerous entries where time is "lumped together," making it impossible to determine if the time spent was

> reasonable in light of the corresponding task. Further, his application contains a great number of entries where he spoke with creditors on the phone about the case.
>
> 5. Maselli failed to take the necessary steps or provide guidance to facilitate an effective reorganization.

33. If a bankruptcy court "determines that the services were incompetently performed and therefore have no value, then such services cannot be compensated." *Id.; see also* <u>LaFrance,</u> 311 B.R. at 25. (Stating, [c]lients come to attorneys for a service. Where the service is not provided, or provided poorly, they should not be required to pay for the service, regardless of the validity of the excuse offered.).

34. A bankruptcy attorney cannot limit his services to preparing petitions and documents without advising the debtor about the process and its obligations. Chapter 11 proceedings are difficult enough for smaller businesses to navigate, and good bankruptcy advice is crucial.

35. Based on the foregoing, Maselli likewise breached his duty to his client by failing to perform competently and by failing to guide Debtor through its bankruptcy. Moreover, most of the services he performed had little value to the estate, especially in light of the countless hearings that were held and motions that were filed in attempts to correct matters that were not properly handled by the Debtor and/or its counsel. "In reality, Maselli acted more like a petition-preparer, than a bankruptcy attorney guiding a debtor-in-possession through a Chapter 11 reorganization case."

36. Reasonableness under 11 USCA § 329(a) is not necessarily gauged by legal services actually rendered, but rather by legal services that are reasonably necessary under circumstances of case. In re McNar, Inc., 116 B.R. 746, 20 Bankr. Ct. Dec. (CRR) 1291 (Bankr. S.D. Cal. 1990), aff'd in part and remanded, 133 B.R. 561 (B.A.P. 9th Cir. 1991) and aff'd in part and remanded, 133 B.R. 561 (B.A.P. 9th Cir. 1991).

   **D. The Debtors Should Be Granted A Real Opportunity To Submit A Plan Of Re-Organization Inclusive Of The Primary Asset And Potential Investors**

37. Based on the record of these proceedings, and Debtors' tireless efforts to find investors with above market cash offers, the Debtors believe that extraordinary events may have occurred in the months leading up to RPGO's withdrawal as counsel on February 11, 2011, the enforcement of the Lift Stay Order, is inequitable). Against this factual background, Rule 60(b) should be liberally construed so that the interests of justice are served. The Debtors should be granted a real opportunity to submit a plan of reorganization that is inclusive of the Building and investors.

38. Based on the record, the Debtors believe that extraordinary events may have occurred in their representation by RPGO. *See Cashner*, 98 F.3d at 578 (recognizing that at times extraordinary circumstances exist when, events not contemplated by the moving party rendering enforcement of the judgment or order inequitable.) Against this background, Rule 60(b) should be liberally construed so that the interests of justice are served. The Debtors should be granted an opportunity to use the Building as a crucial part of their plan of re-organization.

II. **THE SERVICER'S ROLE WITH REGARD TO GECMC 2007 C-1 BURNETT STREET, LLC NEEDS TO BE CLARIFIED GIVEN THE POWERS EXERCISED BY THIS SERVIER ON CREDITOR'S BEHALF IN THESE PROCEEDINGS**

39. Rule 60(b), which is made applicable to bankruptcy cases by Bankruptcy Rule 9024, governs requests for relief from judgments or orders in a bankruptcy court. It provides, in relevant part:

> **Mistake; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, Etc.** On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect;(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

40. A motion for relief from an order is within the broad discretion of the court. *See In re AMC Realty Corp.,* 270 B.R. 132, 143 (Bankr. S.D.N.Y. 2001) *citing Nemaizer v. Baker,* 793 F.2d 58, 61-61 (2nd Cir. 1986). In exercising this discretion, courts should balance the policy in favor of serving the ends of justice against the policy in favor of finality. *AMC Realty Corp.,* 270 B.R. at 143; *see Paddington Partners v. Bouchard,* 34 F.3d 1132, 1144 (2d Cir. 1994).

41. As more fully set forth below, under the circumstances, the possible mismanagement of the Debtors' petition and plan warrants relief pursuant to Rule 60(b).

### E. Grounds Exist Under Rule 60(b)(1) and (3) for the Court to Grant Relief from the Order Lifting the Automatic Stay

42. Upon information and belief, the Servicer, by mistake, inadvertence, or excusable neglect, has not provided a copy of the service agreement governing its relationship with GECMC. Rule 60(b)(1).

43. As stated above, Rule 60(b)(3) states that "the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for: misrepresentation, or misconduct by an opposing party." Fed. R. Civ. P. 60(b)(1). Under this Rule, both intentional and unintentional misrepresentations and failures to disclose provide for a sufficient bases for relief. *See DiPirro v. United States,* 189 F.R.D. 60, 65 (W.D.N.Y. 1999); *Lonsdorf v Seefeldt,* 47 F.3d 893, 897 (7th Cir. 1995). The court must then consider the evidence by balancing "the competing policy interests of the finality of judgment against fundamental fairness in light of all of the facts." *Lonsdorf,* 47 F.3d at 897 (citations omitted); *DiPirro*, 189 F.R.D. at 66.

44. Vacating, or modifying the Lift Stay Order (obtained before the 2004 examination) is warranted under Rule 60(b)(3) as it is intended to protect the fairness of these proceedings and is aimed towards orders and judgments that were unfairly obtained. *See Lonsford,* 47 F.3d at 898 (stating that Rule 60(b)(3) protects fairness and integrity of the litigation process).

45. It is critical that Debtors understand Servicer's authority and potential conflicts in these proceedings. If RPGO had obtained and read a copy of the service agreement, a conflict likely would have been found between the Servicer and

      GECMC Trust regarding the appropriateness of foreclosure proceedings. They were not able to read the service agreement by the Courts deadline and the stay was lifted, as the Court indicated it would be for lack of action.

46. Special servicers, as well as master servicers, are retained by securitization trusts pursuant to a pooling and servicing agreement or other similar agreement and the authority, rights, duties and obligations of such special servicer are contained therein.

47. The servicing standard further requires the special servicer to act in accordance with all applicable laws and the terms of the subject mortgage loans, and to exercise reasonable business judgment with a view towards the "maximization of timely recovery of principal and interest" without regard to (a) any relationship or conflict the special servicer (or any affiliate thereof) may have with the borrower or a certificate holder, (b) the obligation of the special servicer to make advances or (c) the right of the special servicer to receive compensation under the pooling and servicing agreement. The rights and obligations of a special servicer are further restricted by the fiduciary duty owed to the trustee, who in turn has a fiduciary duty to the certificate holders. *Teachers Ins. & Annuity Ass'n v. CRIIMI MAE Servs. L.P.*, 2007 U.S. Dist. LEXIS 28279 (S.D.N.Y. Mar. 20, 2007).

48. Generally, a pooling and servicing agreement grants authority to the special servicer to act on behalf of the lender/certificate holders with respect to any bankruptcy of a borrower. Even so, disputes may still arise. In *In Re Shilo Inn*, the certificate holders of a REMIC made a motion for an order to determine the procedures for voting on a debtor's proposed plan of reorganization after obligors on multiple loans in the REMIC went into default. The certificate holders alleged that each was entitled to vote the trust's claims and not the special servicer. The court denied the certificate holders' motion based on the finding that the pooling and servicing agreement gave the special servicer broad authority "to do or cause to be done any and all things in connection with such servicing and administration of the ... Mortgage Loans which they may deem necessary or desirable," provided it observes the proper servicing standard. *In re Shilo Inn*, 285 B.R. 726 (Bankr. D. Or. Oct. 12, 2002).

49. The certificate holders argued that the pooling and servicing agreement limited the special servicer's ability to take certain actions without the approval or consent of the certificate holders. The court concluded that "even assuming that the restrictions contained in the PSAs effectively preclude [the special servicer] from voting in favor of the debtor's proposed plan of reorganization, that fact does not lead to the conclusion that the certificate holders must therefore be allowed to vote the trusts' claims." The court continued, "the agreement does not restrict [the special servicer] from voting on the proposed plan; it merely restricts how [the special servicer] may cast that vote." The court determined that the special servicer was the correct party to vote, but that it *must cast its vote in line with the wishes of the certificate holders.* The certificate holders did not approve the debtor's reorganization plan and, consequently, the special servicer was required to vote against it.

50. Although the special servicer often is given broad discretion to determine the solution for a loan in default, there are instances when the special servicer is not permitted to modify the loan documents without the express consent of the controlling certificate holder or trustee. In such a situation, the borrower may find it more difficult to negotiate a modification as the controlling certificate holder may be self-interested. The controlling certificate holder may see foreclosure as the best option as it removes a bad asset and guarantees a more immediate financial return for the certificate holders. *In re Shilo Inn*, 285 B.R. 726 (Bankr. D. Or. 2002)

51. Regardless of who makes the final determination, one influential factor is the economic viability of the borrower. If the property is no longer generating sufficient income to pay debt service in addition to expenses, then extending the life of the loan would not alleviate the problem and a special servicer may be reluctant to extend the maturity date. THE ENIGMA OF SPECIAL SERVICERS FINANCING, Loan Agreements Grant Experts Broad Discretion, 11/19/2008 N.Y. L.J. (2008).

52. The Debtors in the instant proceedings can quickly become economically viable if the building is managed at full capacity, or more than 90% capacity with market

rate tenants. It can become even more profitable with continued capital improvements. If it were over 90% capacity today, the Building could provide a stream of income to service the GECMC principle at 4.9%, as well as the other overhead of the Debtors. Debtors have several ideas for a plan that would re-instate the loan and attract cash investors. For any of this to happen, the Servicer must first present the offers to GECMC regardless of Servicer's potential conflicting interest(s).

### "Standing" of Special Servicer v. Certificate Holders

53. For bankruptcy purposes, the securitization trust, and not the certificate holders, is typically treated as the creditor in a chapter 11 case. This raises questions as to the role -- and even the "standing" to appear and be heard -- of the certificate holders as "parties in interest" for purposes of section 1109 of the Bankruptcy Code.

54. In fact, in *In re Extended Stay Inc*, the Bankruptcy Court did not deny standing to appear and be heard to certificate holders. The question of who would vote the mortgage claims was never litigated in that case, however. *In re: Extended Stay Inc*, U.S. Bankruptcy Court, (S.D.N.Y 2010)

55. The case law on this issue is sparse, and it generally remains untested whether, in a case where the Special Servicer is unable or unwilling to act, a court would allow the debtor to directly solicit the votes of the certificate holders. (120910 American Bankruptcy Institute 573, Committee Educational Session: Real Estate Tranche Warfare Real Estate Restructurings: Issues Raised By Complex, Multi-Tranche Financial Structures (2010)).

56. Although certificate holders are technically not part of the negotiations between the Special Servicer (on behalf of the trust) and the debtor, the holders of the most junior in-the-money notes may have the right to replace the Special Servicer if they do not support its efforts. The junior tranches may also play an active role in the negotiations, depending on the dynamics between the Special Servicer and the certificate holders, and any consent rights the certificate holders have

**Restrictions on Special Servicer's Ability to Take Certain Actions**

57. The Special Servicer may not have the right to take certain fundamental actions without the consent of the junior note holders, such as voting on a plan of reorganization.

58. In addition, there may be voting requirements contained in the pooling and servicing agreement governing the Special Servicer, which may hamper the Special Servicer from taking any action, particularly in complicated and contentious bankruptcy cases.

59. For example, A collision of the terms of pooling and servicing agreements and voting concepts under the Bankruptcy Code could have come to a head in the Extended Stay bankruptcy cases, but ultimately, Judge Peck did not have to decide on the conflict. The concern in the Extended Stay cases was how a plan of reorganization could be voted on and confirmed if the CMBS structure impeded voting for such a plan.

60. The problem here is that PSAs are not designed for bankruptcy and therefore do not have mechanisms for addressing collective action by certificate holders, and authority questions between certificate holders and a Special Servicer in a bankruptcy context. In particular, PSAs typically do not have specific provisions governing voting or other actions in a chapter 11 case. It is therefore left to the court's discretion to determine what is to be done to protect the interests of the Debtors and the PSA creditors.

61. In *In re: Extended Stay Inc*, U.S. Bankruptcy Court, (S.D.N.Y 2010) the judge did not have to assess the voting requirements in the Trust and Servicing Agreement or related documents or make a determination on whether or not the CMBS structure should be disregarded for purposes of effectuating a plan of reorganization. Instead, the confirmed plan proposed a roughly $3.9 billion payment to the CMBS trust, as a result of a successful auction for a plan sponsor, which was close to the amount of the mortgage debt. This result was viewed by the Special Servicer as a *de facto* or deemed foreclosure permitting it to find authority within its governing documents to vote in favor of the Plan, without

having to address any of the stringent consent rights and voting requirements that might have applied at lower or non-cash recoveries.

62. Therefore, it is implied from this decision that in short sale type situations, a court might be more inclined to allow a debtor to delve into the servicing agreement between trustee and special servicer as a means of deciphering who ultimately has authority to reject or approve a proposed reorganization plan. *Id.*

63. Consistent with the efforts to pursue all available avenues to achieve a successful vote on a plan, and due to difficulties reaching agreement with the initial Special Servicer regarding the mechanics of voting, the Debtors filed a Motion Pursuant to Bankruptcy Rule 2004 Authorizing Discovery, requesting that the Certificate Custodian and the Certificate Registrar Agent produce the Certificate Registrar so that the Debtors could identify the holders of the certificates in the trust and enable them to participate in the plan process if negotiations with the Special Servicer failed. *Id.*

64. In addition, the Commercial Mortgage Securities Association joined in the objection of the Successor Trustee. The CMSA expressed its concerns regarding the chilling impact that the precedent of granting the discovery motion could have on the CMBS market. The CMSA also argued that in the CMBS industry, the standard is that mortgagors are not entitled to obtain information such as the certificate information that the debtors were seeking because such information is property of the trust and is irrelevant to the debtors, since the Special Servicer is the sole party entitled to negotiate the treatment of the mortgage debt in a plan of reorganization. *Id.*

65. The Bankruptcy Court granted the Debtors' motion, noting, "I believe that debtor's counsel has made a compelling argument that really has nothing to do with the internal structure of the Trust and Servicing Agreement, the standing of the certificate holders to vote or to influence directly the bankruptcy case. But it has to do with the debtor's ability to understand the political terrain in which it is functioning." *Id*. November 12, 2009 Transcript, at 42. The court emphasized that this was a 2004 discovery motion, and that the certificate holders "identity is potentially material to the debtor's ability to propose a workable plan structure.

And I also believe that it is reasonable for the debtor, independently, to conduct what I've called in my bench remarks, diligence. It is reasonable and appropriate for a debtor, in these circumstances, to understand who's driving the bus and who may be in the passenger seats." November 12, 2009 Transcript, at 43.

66. The Debtors have repeatedly requested a copy of the pooling and servicing agreement from Servicer and they have yet to provide a copy, or adequate information to permit Debtors to find it on their own.  Debtors can only assume that the GECMC service agreement is typical of such agreements in that it creates a conflict between Servicer and GECMC as to the treatment of the asset in these proceedings.

67. For these reasons and those stated in all preceding paragraphs, the Debtors submit that as a result of the inactions of RPGO and Servicer Debtors were denied a fair opportunity to create a meeting of the minds with GECMC with regard to the debt owed.  The Debtors request that (i) the GECMC servicing agreement be produced, and (ii) that they order lifting the stay be vacated.

## CONCLUSION

68. Debtors seek reconsideration of the Order granting relief from the automatic stay. Furthermore, Debtors seek argument and a ruling on the 2004 examination issue.  It is only just that Debtors receive a fair opportunity to be represented *and* negotiate in good faith to reorganize their substantial business interests.  Enforcing the automatic stay for a reasonable time while a plan is negotiated will likely result in far greater profits for the GECMC investors and Debtors, than foreclosure proceedings would.

69. Debtors seek clarification or confirmation from GECMC as to whether a foreclosure proceeding is deemed more efficient for the GECMC Trust than immediately available, above market, cash offers from Debtors' potential investors.

70. Debtors seek clarification from the Servicer and GECMC Trust as to when and how the Servicer may act in these proceedings. If it is disclosed that Servicer's interests create a conflict that may impair their voting, then it is respectfully requested that all offers must be presented in their entirety to the GECMC Trust.

71. The resulting harm and prejudice associated with allowing the foreclosure proceedings to continue is neither speculative nor remote.

72. Based on the above, the Debtors respectfully submit there exists sufficient grounds for the Court to exercise its discretion to clarify Servicer's role in these proceedings and vacate or modify the order granting Servicer and GECMC relief from the automatic stay.

WHEREFORE, for all the reasons set forth herein, the Debtors respectfully request that this Court enter an order (i) vacating or modifying the order to lift the bankruptcy stay as applied against the interests of the Servicer and GECMC, and (ii) granting the Debtors' request for a pooling and servicing agreement, or 2004 examination regarding same, and (iii) granting such other further relief as thus Court deems just and proper.

Dated: New York, New York
February 16, 2011

                                    Dwyer & Associates LLC
                                    *Attorneys for the Debtors*

                              By:    /s/ Tanya P. Dwyer
                                    Tanya P. Dwyer, Esq. (TD2845)
                                    11 Broadway, Suite 615
                                    New York, NY 10004
                                    (212) 518-3663

**Exhibit A: December 20, 2010 Hearing Transcript**

**Exhibit B: Receiver Wheeler's Email Stating that above FMV Offer Would not be Presented to GECMC Trust.**

**Exhibit C: Cash Offers and Letters of Intent regarding Building Purchase**